RAILROAD COMMISSION OF TEXAS V. HOUSTON AND TEXAS CENTRAL
RAILWAY COMPANY.

Decided January 28, 1897.

1. Railroad Commission—Constitution—Correction of Abuses.

Article 10, section 2, of the Constitution of the State empowers and directs the Legislature to enact laws to "correct abuses" on the different railroads in this State, and this embraces the right and duty to pass laws for the correction of all abuses or improper uses of the franchises which had been or might be granted to railroads in this State, as well as all abuses connected with or growing out of the business transacted in the exercise of such franchises. The power was not limited to the correction of abuses in the rates of freight and passenger tariffs. (Pp. 349 to 351.)

2. Same—Construction of Act Creating.

The same construction and effect is to be given to the power to "correct abuses" conferred by the Legislature on the Railroad Commission (Rev. Stats., arts. 4562-4569), and the powers conferred thereby are not limited to regulation of freight and passenger tariffs. (Pp. 351, 352.)

3. Same—Regulating Compressing Cotton.

The Railroad Commission had jurisdiction and authority under the Constitution, to make and enforce the regulations of the compressing of cotton shipped over railways embraced in Com. Tar. No. 1A, promulgated June 21, 1895, and amendment thereto of Oct. 7, 1895,—if not found unreasonable or unjust. (Quaere, whether it possessed such power independent of the authority given in the amendment to art. 10, section 2, of Constitution.) (Pp. 349, 355.)

4. Same—Abuses—How Defined.

It seems that the power of the Railroad Commission to correct abuses extends only to such as are defined by law, and does not authorize them to enact a law defining what is an abuse. (P. 352.)

5. Same—Giving Preference or Advantage.

Revised Statutes, article 4574, subd. 1, defining unjust discrimination and prohibiting railroad companies from giving any undue or unreasonable preference or advantage to some particular person, etc., is not limited to such preference or advantage in freight or passenger rates, and the Railroad Commission has power to make regulations correcting such abuses. (Pp. 351, 352.)

**6. Same—Test of Unreasonabless.**

In actions instituted under articles 4565 and 4566 Rev. Stats., to determine whether regulations adopted by the Railroad Commission are unreasonable and unjust, the test of reasonableness is not in a consideration of the question whether such regulation amounts to a taking of property without proper compensation,—such test being only applicable in determining the constitutionality of the law. The reasonableness and justice of the regulation is to be determined by the same rules as if it were an issue in other classes of suits, except as to the conclusive character of the evidence required. (Pp. 353, 354.)

QUESTIONS CERTIFIED from Court of Civil Appeals, Third District, in an appeal from Travis County.

*M. M. Crane,* Atty. Genl., and *J. L. Harris,* for appellant.—It is the duty of the Railroad Commission of Texas to adopt all necessary rates, charges, and regulations to govern and regulate railroad freight and passenger tariffs, and to fix all charges which are necessary and proper for any service rendered by the railroad company in addition to the carrying of freight and passengers. That is to say, for all other services performed by the railroads in addition to the carrying of the freight and passengers. Rev. Stats., 1895, art. 4562, especially first paragraph and subdivisions 2, 5, 6, 8, 10 and 11.

The power to govern and regulate railroad freight and passenger tariffs includes the general power to prescribe all of the rules by which the freight and passenger tariffs may be made, and to dictate the form in which the products must be put, upon which the rates are fixed, in order to facilitate the traffic, or for any other beneficial purpose in connection therewith, subject to judicial review, to determine whether the regulation is reasonable. Ex parte Byrd, 84 Ala., 17; Miller v. Jones, 80 Ala., 89; How. & Burns, Mun. Pow. and Ord., sec. 30; Cronin v. People, 82 N. Y., 318; Livery Stable Cases, 16 Mo. App., 131; Anderson's Law Dictionary, 869; Gloucester Ferry Co. v. Pa., 114 U. S., 203; Harvey v. U. S., 3 Ct. Claims, 39; Atty.-Gen. v. Boston, 142 Mass., 203; Williams v. State, 48 Ind., 307; State v. Adamson, 14 Ind., 296; Polinsky v. People, 73 N. Y., 65; In re Wilson, 32 Minn., 145.

The term "regulate" includes the doing of everything that is deemed by the Commission necessary or proper to make the rate-making more effective. Chicago Pack. & Prov. Co. v. Chicago, 88 Ill., 221; Missouri v. Clark, 54 Mo., 17; Comrs., etc., v. Judges, 17 Wend., 9; Biddle v. Com., 13 S. & R., 409; New York v. Miln, 11 Pet., 102; Gibben v. Ogden, 9 Wheat., 1.

The power to regulate freight tariffs includes the power and authority to do all things reasonably necessary or desirable to accomplish that result, and also includes the power to prescribe all necessary or desirable rules in respect to the form, size, and condition of the freight for which the rates should be charged. Gloucester Ferry v. Pennsylvania, 114 U. S., 203; St. Paul v. Smith, 27 Minn., 364; Slaughter House Cases, 16 Wall., 36.

The State has the right to put its products into whatever form it

pleases before they may be shipped.   Turner v. Maryland, 107 U. S., 51.

To enable the railroad companies to economize space, and thus to more readily move the freight, the Commission is authorized to require the compression of cotton to the density named in the regulations.

A fair construction of the statute creating the Commission gives to it all of the power over the shipment of freight and all matter pertaining thereto formerly held by the Legislature, as well as the common carriers themselves.   Rev. Stats., art. 4562.

The primary object of the establishment of the Railroad Commission, being to fix reasonable and just freight rates, which would be fair alike to the railroads and shippers, cannot be accomplished unless the implied power be conceded, if the express power be denied, to dictate the form in which the products may be put, so that space may be economized, and the railroads thereby enabled to reduce the rates without injury to themselves.   Lotspeich v. Railway, 73 Ala., 306.

The act creating the Railroad Commission, and particularly section 30 thereof, vested in said Railroad Commission the power to adopt all necessary rates, charges and regulations, and to cover and regulate railroad freight and passenger tariffs; the power to correct abuses and prevent unjust discriminations, and to enforce the same by having the penalties inflicted, etc.; and conferred on the Railroad Commission the power to prescribe rules requiring cotton to be compressed, if in the judgment of the Commission that rule became necessary or desirable, to enable the railroads to facilitate their business, and to enable the shipper to have his products more speedily moved to the markets.   And the question only of the reasonableness of the regulation could be inquired into by the courts.

The real question involved in this case is shall the Railroad Commission have power to require the railroad companies to permit cotton to be unloaded in transit, for the purpose of compression, and to superintend the compression of that cotton, paying for it the money of the shipper which they had received at the initial point, for that purpose.

The power to have cotton compressed may be fairly based on subdivision 11 of art. 4362, which says:  "The Commission shall have power to prescribe reasonable rates, tolls or charges, for all other services performed by any railroad subject hereto."

The rules complained of are practically nothing more than the fixing of one rate for hauling uncompressed cotton, and another rate for compressed cotton.

The next question which presents itself is, were these regulations unjust or unreasonable to the plaintiff?   Acting within the scope of its authority, the Legislature, or its agency, the commission, may make such rules and regulations as to it may be deemed necessary.   They will be reviewed by the courts for one purpose, and one purpose only—that is to ascertain whether they are unjust and unreasonable,—in other words, to ascertain whether the Legislature or the Commission had the power

to make them. The power of the Legislature is limited in only one way. It cannot require railroad companies to use their property in such a manner as to render it unremunerative and unprofitable,—in other words, they cannot take from the railroad companies their property without due process of law. To the courts is committed the duty of preventing the confiscation of property, either directly or indirectly. It thereby becomes the duty of the courts to inquire whether the laws passed by the Legislature or the regulations passed by the Commission will necessarily result in the confiscation of the railroad property. Reagan v. Farmers' L. and T. Co., 154 U. S., 397; Railway v. Iowa, 94 U. S., 155; Peik v. Railway, 94 U. S., 164; Minnesota Case, 134 U. S., 455.

*Frank Andrews* and *Baker, Botts, Baker & Lovett,* for appellee.—At the outset, we desire to be understood to concede, as we have conceded from the first, that primarily, and in the absence of any constitutional inhibition, the Legislature would have the power to pass a law regulating compresses alone, or a law regulating compresses and railroads in connection with each other, in so far as they sustained any relations to each other.

The Legislature had the power originally, and without any constitutional mandate to that effect, to pass laws regulating railroads, fixing freight and passenger tariffs, and dealing with them as common carriers, and the provisions of article 10, section 2, in so far as the same affected the power of the Legislature, operated merely as a command to the Legislature to do certain things, in the exercise of that power which it would have possessed in the absence of any constitutional provision upon the subject.

An examination of the Constitution will disclose that, as originally submitted to the people by the constitutional convention, and ratified by them in 1876, section 2 of article 10 did contain the command to the Legislature to pass laws to correct abuses. It will be observed that this language was changed in the amendment by preceding the words, "to correct abuses," with the words, "to regulate railroad freight and passenger tariffs." The command "to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State" is the same in the old as in the new, and the amendment otherwise conferred upon the Commission the power to establish means for the accomplishment of the objects and purposes before named. Therefore, the reasoning from the premises, that when the amendment was adopted one of the powers intended to be conferred by the Legislature upon the Commission was to correct abuses, is without force, because this language was already in the Constitution, and if construed as sufficient now, it was sufficient before the amendment, being but a repetition of what the Constitution formerly contained, and the people, in adopting the amendment in 1890, could not be held to have had any especial purpose in adopting the same language in the amendment that had theretofore existed.

In the original article the Legislature was not commanded to pass laws "to regulate railroad freight and passenger tariffs," but it commanded the Legislature to pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs, which is the identical language that occurs in the amendment. Grammatically construing the original command by the people to the Legislature, as given in this article of the Constitution, the command "to correct abuses" is indissolubly connected with the subsequent phrase "to prevent unjust discrimination and extortion in the rates of freight and passenger tariffs." The language "to correct abuses" is as clearly qualified by the words "in the rates of freight and passenger tariffs" as are the words "to prevent unjust discrimination and extortion."

If it had been the intention of the original Constitution of 1876, or of the amendment, which is the same thing, that the words "to correct abuses" should be construed to apply to other matters than the subject dealt with, that is, freight and passenger tariffs, it seems to us that some unmistakable language would have been used to make that intention plain, because it is evident, from the reading of the Constitution, that it was but attempting to emphasize the command to the Legislature to deal with the subject of freight and passenger tariffs. If it had been intended to have dealt with railroads in relation to other matters, surely the Constitution would have said to correct abuses in the management, operation, control, or some other matter in which the abuse was desired to be corrected.

It seems to us to be illogical to concede that the words, "on the different railroads in this State," qualify the words, "to correct abuses," when there is no separation of these words from the other words in the sentence, and they follow, and are further removed from, the words, "to correct abuses," than are the words immediately preceding the admitted qualification "in the rates of freight and passenger tariffs;" and it seems to us that to admit any part of the succeeding portion of the sentence, after the words "to correct abuses," to qualify these words, is to admit of necessity that the succeeding prepositional phrase in its entirety must be held to qualify the words "to correct abuses."

We conclude therefore, as heretofore contended, that the Legislature was authorized by the Constitution to create the Commission for the purpose of regulating, that is, fixing, the rates that might be charged; and, second, to prevent abuses, discriminations and extortion in relation to those rates.

In passing this statute, the Legislature has but emphasized the construction which we have contended for, under the Constitution; the power conferred is strictly, exclusively, and solely, in relation to freight and passenger tariffs. The Commission is commanded to adopt all necessary rates, charges and regulations to govern and regulate freight and passenger tariffs; it is commanded to adopt all necessary rates, charges, and regulations to govern and regulate abuses in freight and passenger tariffs, and to prevent unjust discrimination and extortion in the rates of freight

and passenger tariffs on the different railroads in this State. This power clearly includes all of the power conferred in the following twelve subdivisions of article 4562, and it would be impossible to discover any power, not mentioned in those twelve subdivisions, for which authority is not granted in the language quoted. There is not a declaration in this article, nor in any subdivision thereof, which has any reference to any abuses, or confers any authority upon the Railroad Commission to do or perform any act, which does not have some direct connection, in some manner, with freight or passenger tariffs.

The fact that the Commission is charged with the enforcement of all laws relating to railroads in the State, is without force, for that, if there is no law which authorized the Commission to make the rules and regulations in question, it is not charged with the enforcement of any such law, nor is it charged with the duty of making any such law; and the question presented in this case is originally as to the authority of the Commission, or, if you please, the existence of the law authorizing the Commission to make the rules and regulations in question.

BROWN, ASSOCIATE JUSTICE.—The Court of Civil Appeals for the Third Supreme Judicial District, has certified to this court the following statement and questions:

"By an order made and entered by the Railroad Commission of Texas, on the 21st day of June, 1895, said Commission established and promulgated 'Commodity Tariff No. 1-A,' whereby it prescribed a schedule of rates in cents per hundred pounds, to apply by direct short line mileage on all shipments of cotton in bales, actual weight, in quantity transported by any railroad between points in Texas, and ordered that the same should take effect July 15, 1895, there being no difference in the schedule in the rates on compressed and uncompressed cotton; and in the same order established, for the government of appellee, as well as all other railway carriers in the State, the following rules and regulations:

" 'First. A shipper, desiring his cotton to be delivered at destination uncompressed, shall give to the railroad company notice of such desire by inserting in his bills of lading the notation, "to go through uncompressed," or other plain words of similar import, and it shall be the duty of the railroad company accepting such shipment to make delivery at destination accordingly.

" 'Second. A shipper, desiring his cotton delivered at destination compressed, shall, when no compress is in operation at shipping point, give to the railroad company notice of such desire by inserting in his bills of lading the notation, "to be compressed in transit," and it shall be the duty of the railroad company accepting the shipment to comply with such instruction, if there is an accessible compress at a station directly intermediate between shipping point and destination.

" 'Third. Railroad companies shall assume the cost of compressing cotton which is to be delivered at destination compressed, only on the following conditions:

" '1.  Cotton shall be compressed at shipping point when an accessible compress is in operation at such point.

" '2.  When no compress is in operation at shipping point, the cotton shall be compressed at a station directly intermediate between shipping point and destination, and distant seventy miles or more from such destination.  Compresses being in operation at two or more stations directly intermediate between shipping point and destination, the compress nearest to shipping point shall be selected to compress such cotton.

" '3.  The amount of the cost of compressing assumed by railroad companies shall not exceed ten (10) cents per 100 pounds, out of rates that are not less than 45 cents per 100 pounds, between stations subject to rates prescribed in table of rates, section 1, of this tariff, nor less than 45 cents per 100 pounds to Houston, from points specified in exceptions, section 2 of this tariff.  When the rates between such stations are less than 45 cents per 100 pounds, the railroad company shall assume only so much of the cost of compressing as will make the aggregate of such cost and the current freight rate not to exceed 45 cents per 100 pounds.

" 'Fourth.  For the purpose of concentration, cotton may be shipped at full tariff rates to compress stations distant, from all points on the gulf coast, 100 miles or more of railroad mileage, with the following adjustment of freight charges before and after such concentration, provided that there shall be no compress in operation at original shipping point, or at a station intermediate between such point and the point at which it is desired to concentrate.

" '1.  Each railroad company shall refund only its own charges for the services of concentrating.

" '2.  The entire charge for concentration shall be refunded when the point of concentration is directly intermediate between shipping point and final destination, as reached by the line on which such cotton originates, and the rates from original shipping point and concentrating point to such destination are the same.

" '3.  When the concentrating point is not in the direction of final destination, as reached by the line upon which the cotton originates, such line, on receiving the cotton for reshipment, shall refund an amount sufficient to make the following charges per bale over and above the current rate from concentrating point to final destination:  For distances of 50 miles and less, 25 cents; 75 miles and over 50 miles, 35 cents; 100 miles and over 75 miles, 50 cents.  Cotton concentrated out of the direction of final destination for distances exceeding 100 miles shall be subject to full tariff.'

"Subsequently, on October 7, 1895, said Commission made and entered an order and promulgated the same as 'Circular No. 173' amending Commodity Tariff No. 1-A for the government of appellee, as well as all other railway companies of the State, as follows:

" 'CIRCULAR No. 173.

" 'Austin, Texas, October 7, 1895.

" 'It is ordered and· adjudged by the Railroad Commission of Texas,

that Commodity Tariff No. 1-A, issued by said Commission on June 21, 1895, to apply on shipments of cotton in bales transported by railroads between points in Texas, and made effective July 15, 1895, be and the same is hereby amended by adding to Section 3 thereof the following rules and regulations:

" 'Fifth.  Cotton which is to be delivered in compressed condition at destination, shall be compressed that the density of each bale at destination will be not less than 22½ pounds per foot, cubic measurement.

" 'Sixth.  When a railroad company receives uncompressed cotton, which is to be delivered in compressed condition at destination, said railroad company shall require of the compress company, entitled under these rules to perform the work, a written guarantee, with good and sufficient sureties, to reimburse said railroad company the amount of expenses it may incur by having such cotton recompressed, in case the first compressing is found to be defective and so declared by competent inspectors.

" 'Seventh.  In case a compress company shall fail or refuse to execute such guarantee, it shall then be the duty of the railroad company transporting such cotton to deliver the same for compression to the next nearest compress, located in the direct route to destination, which will perform the work under the required guarantee, provided that other requirements with regard to compressing in transit, as set forth in paragraphs 2 and 3 of third rule above, shall be complied with in all instances.

" 'Eighth.  To establish, through a railroad company, the responsibility of a compress company for defective compressing, the shipment of cotton involved shall be inspected within four days after its arrival at the point where such matter is to be decided, and a copy of the certificate or report of the condemnation, embracing a detailed account of the result of the inspection, shall be forwarded to this Commission by the agent of the railroad company.

" 'Ninth.  When a railroad company receives compressed cotton for shipment, the bills of lading issued for such cotton must be made to bear notations relieving said railroad company of any obligation to require or enforce a guarantee of the work performed by the compress company; but this provision is not intended to relieve the compress company from liability to the shipper or owner of the cotton for the cost of recompressing when that shall be found to be necessary.

" 'This order shall take effect October 14, 1895.'

"Appellee, the Houston and Texas Central Railroad Company, at the time of the establishment of such rules and regulations, owned and operated, and now owns and operates, a line of railway from the city of Houston, in Harris County, to Denison, in Grayson County, with a branch line extending from the main line at Hempstead, in Waller County, to Austin, in Travis County, and is subject to and bound by the above recited rules and regulations, if the same are valid.

"October 31, 1895, appellee, the Houston and Texas Central Railroad Company, being dissatisfied with the above recited rules and regula-

tions, instituted this proceeding, in conformity with the provisions of section 6 of the Act of April 13, 1891, establishing the Railroad Commission (Rev. Stats., 1895, art. 4565), by filing a petition setting forth, appropriately and in detail, the particular causes of objection to such rules and regulations, against said Commission as defendant, and praying that the Commission be enjoined from enforcing the said rules and regulations as against it, and for a judgment finding and decreeing that the above recited rules and regulations are unreasonable, unfair, unjust and unlawful, and that the same be canceled and held for naught, etc. And while alleging and offering evidence tending to show that the effect of such rules and regulations was to hamper and restrict it in its legitimate business and proper performance of its public duties, subject it to expense, loss and inconvenience, and injure, inconvenience and annoy its patrons and the shippers over its lines, without advantage or benefit to shippers or to the public at large, appellee did not allege or claim that said rules and regulations would, after deducting all losses in revenue and considering increase in expense of operation as alleged results thereof, amount, in view of its whole earnings, to the taking of its property without just compensation, or without due process of law, contrary to the Constitution of this State and of the United States; but contended, in effect: first, that the Commission was and is without jurisdiction, power or authority, under the Constitution of this State and the statutes creating said Commission, providing for its organization and defining its powers, to make and establish said rules and regulations; and, second, that if the Commission had the power, authority and jurisdiction to establish such rules and regulations, then the same were in their practical working and operation, as applied to appellee, unreasonable, unfair and unjust, and upon proof of the facts alleged should be so declared, and accordingly set aside and annulled.

"A trial in the court below resulted in a decree cancelling, annulling and setting aside said rules and regulations, and enjoining and restraining the Commission from enforcing the same as against appellee, and on appeal therefrom by the Commission the following, among other questions, arise for decision in determining said appeal, to-wit:

"First.   Did the Railroad Commission of Texas have jurisdiction, power and authority to adopt and enforce the above recited rules and regulations?

"Second.   If said Commission has the power to adopt and enforce such rules and regulations, then had the court below, and has this or any other court, the power and jurisdiction to review the action of the Commission in the premises, so as to determine whether such rules and regulations are reasonable, fair and just, or otherwise, in the absence of any plea or proof that they amount to a taking of the railroad company's property without just compensation or without due process of law?"

We understand the position taken by counsel for appellee to be:   (1) That, under section 2, article 10, of the Constitution, the Legislature could not confer upon the Railroad Commission power to make the regu-

lations complained of in this case; (2) that the law which the Legislature enacted does not confer upon the Railroad Commission the authority to make the regulations in question.

Article 10, section 2, of the Constitution, reads as follows: "Railroads heretofore constructed or which may hereafter be constructed in this State are hereby declared public highways and railroad companies, common-carriers.  The Legislature shall pass laws to regulate railroad freight and passenger tariffs, correct abuses, and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, and enforce the same by adequate penalties, and to further accomplishment of these objects and purposes may provide and establish all requisite means and agencies, invested with such powers as may be deemed adequate and advisable."

For the purpose of determining the first question stated, we will assume that the law under which the Railroad Commission acts and by which it was created does confer upon it the power to make the regulation in regard to compressing cotton, of which complaint was made in this case.

In the view that we take of the first question presented, it is unnecessary for us to consider the further question whether the Legislature of the State has the power, itself, to enact like regulations, and whether it might confer authority upon the Commission to make such regulations as those in question, independent of the Constitution.  We have considered the matter as if the authority exercised by the Legislature must be derived from the Constitution, not intending to hold that it might not have been exercised independently of the provisions of article 10, section 2, of that instrument.

When the Legislature of the State came to enact the law, it devolved upon that body to determine the question of its power, as measured by the constitutional provision quoted herein.  (Wright v. Adams, 45 Texas, 134; Gunter v. Texas Land & Mortgage Co., 82 Texas, 503.)  While it is true that the duty of construction first devolved upon the legislative department, it is likewise true that the ultimate decision and determination of the question must be made by the judicial department.  In exercising this jurisdiction, courts must be governed by the well-established rule of construction, that an act of the Legislature will not be held unconstitutional unless it is clearly contrary to some provision of that instrument.  (Sutherland v. De Leon, 1 Texas, 304; Orr v. Rhine, 45 Texas, 354; Barker v. Torrey, 69 Texas, 12.)    In the case last cited, the court said:  "The rule is that a law will not be declared unconstitutional unless it is clearly so, and in cases of doubt it will be held valid.  The opinion of the Legislature of its constitutional power is entitled to great weight; and, if it had not clearly the power to suspend for a time the right of the State to forfeit the right of purchasers of school lands, the question is, to say the least, a matter of such doubt as to render it improper for this court to declare its act unconstitutional."

It is claimed that the laws which the section of the Constitution quoted

above commands the Legislature to pass relate solely to the subject of freight and passenger tariffs. If this be a correct interpretation of the language of the Constitution, we think it doubtful whether the authority to make regulations for compressing cotton could be derived from it.

The phrases "the Legislature shall pass laws to regulate railroad freight and passenger tariffs" * * * "and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State," etc., do relate exclusively and directly to the subject of rates, and embrace all the authority which could be exercised to accomplish those purposes. Between these two phrases occur the following words: "To correct abuses;" which, if construed as relating to the same subject, can add nothing to the sentence, because the entire subject of rates of freight and passenger tariffs was embraced in the preceding and succeeding language. The words "to correct abuses" embrace everything which is expressed in the language that precedes and that which follows it, but they express more, and to give effect to them we must hold that they were intended to have the full force of their ordinary meaning.

The amendment to the Constitution from which we have quoted, deals with the general subject of railroads and railroad companies, and the first sentence declares a most important principle,—that railroads are public highways and railroad companies common carriers. This declaration of the fundamental doctrine upon which the succeeding provisions rest was made as the basis for the laws which the Legislature was commanded to enact. The provisions which direct the Legislature to enact laws by which control over the public highways and common carriers may be exercised to the fullest extent, are in harmony with the subject matter of the amendment and the policy of the State as declared therein.

It is said that it is a matter of history that the adoption of the amendment was brought about by dissatisfaction as to the rates of railroad charges, and that it was this subject which was discussed before the people and in the legislative bodies during the pendency of the amendment. We think that it is true that the rates charged and alleged abuses connected therewith were more generally discussed than any other phase of the question, but it was not the only ground of complaint urged at the time.

In order to ascertain what the intention of the people was in amending the Constitution, we must resort to its language, bearing in mind that the Legislature, in submitting the resolution, and the people, in voting upon it, were dealing with public highways and common carriers, corporations invested with franchises and privileges derived from the State and charged with duties to the public. The word "abuses" as used in this amendment means "any improper use of a right or a privilege; as, abuse of a franchise." (Standard Dict.—word, Abuse; Railroad Company v. Casey, 26 Pa. St., 318.) The language "the Legislature shall pass laws to correct abuses" is competent to express a command to the legislative department to pass laws for the correction of all abuses or improper uses of the franchises which had been granted or might be

granted to railroads in this State, as well as all abuses connected with or growing out of business transacted in the exercise of such franchises. The conclusion that the Legislature and the people intended, by the use of this language, to direct the general control of the public highways and common-carriers of the State and to prevent their abuse of the privileges and franchises conferred upon them, we think justified by the consideration of the subject and the necessities and circumstances which produced this action on the part of the people. To have confined the constitutional amendment to one character of abuse, and to have limited the means of control to one. subject, out of the many embraced within the general range of the authority to control these highways, we think inconsistent with true statesmanship, and it would have fallen short of adequate provision to protect the interest of the public. It was wise to provide in the amendment for the prevention and correction of such abuses in the future, even if none existed at that time. The appellee contends for a construction of the language of the Constitution, which would be stated thus: "The Legislature shall pass laws to correct abuses in the rates of freight and passenger tariffs on the different railroads in this State," and it is urged that any other construction leaves the power "to correct abuses" unlimited, and it may be applied to any character of abuses. The section of the Constitution has but one subject, which is —railroads as highways, operated by railway companies as common carriers, and its language must be construed as limited to that subject. The language "to correct abuses" is qualified by the phrase "on the different railroads in this State." The intention embodied in the section of the Constitution is fairly expressed by the following analysis of its provisions:

The Legislature shall pass laws to regulate railroad freight and passenger tariffs on the different railroads in this State, etc.

The Legislature shall pass laws to correct abuses on the different railroads in this State, etc.

The Legislature shall pass laws to prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this State, etc.

The second question for our consideration is, Has the Legislature conferred upon the Commission the power or authority to make regulations to govern compressing cotton for shipment?

In prescribing the official oath for the commissioners the law requires that, in addition to the oath prescribed by the Constitution, each of them shall swear "that he will, to the best of his ability, faithfully and justly execute and enforce the provisions of this chapter and all laws of this State concerning railroads." Article 4579 contains this provision: "It is hereby made the duty of such Railroad Commission to see that the provisions of this chapter and all laws of this State concerning railroads are enforced and obeyed, and that violations thereof are promptly prosecuted, and penalties due the State therefor recovered and collected." And in subdivision 1 of the same article, this language is used: "It shall

be the duty of the Commission to investigate all complaints against rail-road companies subject hereto, and to enforce all laws of this State in reference to railroads."

Article 4562, Revised Statutes, reads as follows: "The power and authority is hereby vested in the Railway Commission of Texas, and it is hereby made its duty, to adopt all necessary rates, charges and regulations to govern and regulate freight and passenger tariffs, the power to correct abuses and prevent unjust discrimination and extortion in rates of freight and passenger tariffs on the different railroads in this State." By these provisions the Legislature has committed to the Railroad Commission the enforcement of all the laws of the State concerning and regulating railroads, and has, in the statute which created the Commission, copied almost literally the language of article 10, section 2, of the Constitution, in which the power is given specifically to the Commission "to correct abuses." Having used the same language as that used in the Constitution and in the same connection, we conclude that the Legislature intended expressly to delegate the power to the Commission that the Constitution authorized to be delegated to a legislative agency, and the language of the Constitution not being confined to correcting abuses in the rates of freight and passenger tariffs, we hold that the power here conferred by the Legislature upon the Commission empowers it to correct abuses other than those which may be connected with the rates of freight and passenger tariffs.

The question then arises, What abuses can the Railroad Commission correct? We think that it must be some abuse which has been defined by the law, and that the Commission would not by this power be authorized to enact a law defining what is an abuse or a disregard of duty on the part of a railroad corporation.

Has the Legislature of Texas defined any act or acts as an abuse on the part of the railroad companies under which the Commission would have power in the suppression or correction thereof to adopt the regulations in question?

Article 4574, subdivision 1, of the Revised Statutes, is in this language: "It shall also be an unjust discrimination for any such railroad to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or to subject any particular description of traffic to any undue or unreasonable prejudice, delay or disadvantage in any respect whatsoever." We think that the railroad companies in transporting cotton might give undue and unreasonable preference or advantage to some particular person, company, firm, corporation or locality; or might subject the cotton to undue and unreasonable delay, and that the regulations prescribed by the Commission would be necessary to correct and prevent such abuses.

If the construction of the Constitution and the law contended for by the appellee be adopted, the Commission has no power to make any regulation by which any discrimination defined in the article above quoted could be corrected or prevented. The discrimination defined

has no reference to rates of freight or passenger tariffs and, with a large part of the bill, must be held to be unconstitutional under the construction claimed.

This action was instituted under sections 6 and 7 of the original act which created the Railroad Commission and are now embraced in the Revised Statutes of the State, and so far as pertinent to the question before us read as follows:

"Article 4565. If any railroad company or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act or regulation adopted by the Commission, such dissatisfied company or party may file a petition, setting forth the particular cause or causes of objection to such decision, act, rate, rule, charge, classification or order, or to either or all of them, in a court of competent jurisdiction in Travis County, Texas, against said Commission as defendant."

"Article 4566. In all trials under the foregoing article the burden of proof shall rest upon the plaintiff, who must show by clear and satisfactory evidence that the rates, regulation, order, classification, act or charges complained of are unreasonable and unjust to it or them."

It is claimed by the Attorney General on behalf of the Railroad Commission, that the courts have no power under this law to review the action of the Railroad Commissioners in regard to any of the matters enumerated unless the complainant shall show that the act complained of amounts to a taking of property without proper compensation or without due process of law, and in support of this position it is asserted that prior to the enactment of this law the words "unreasonable and unjust," when used in reference to the action of legislative bodies and of commissions created by them, had received the interpretation that such acts must be unreasonable and unjust to the extent of being violative of the Constitution, and that the words "unreasonable and unjust" must be so construed because it will be presumed that the Legislature used them in that sense. We know of no decision of any court which has defined either "unreasonable" or "unjust" to mean that the act so characterized is the taking of property without proper compensation or without due process of law. It is true that the courts have established the rule that the reasonableness and justice of rates fixed by the Legislature, or by a Commission empowered by it so to do, are ordinarily questions committed to the discretion of those bodies, and not subject to revision by the courts, but in such cases the law did not authorize any revision of such action by the judicial department. It has been generally held, especially by the Supreme Court of the United States, that the action of the Legislature of a State or of a commission created by it, in fixing rates of transportation, would be revised and would be set aside and annulled, when it violates the constitutional right of the carrier to that degree that it amounts to a taking of property without proper compensation or without due process of law. But in doing so the courts have not revised the exercise of discretionary power on the part of the Legislature or the Commission, but it is an interference on the part of the ju-

diciary to protect parties against a violation of the Constitution of the United States or of the State, whether it be in making or enforcing the law. It has not been held that every rate, rule or regulation which does not violate the Constitution is reasonable, but that extreme degree of unreasonableness which confiscates property gives jurisdiction to the court. If our statute has not changed the law, the same test must be applied in this case.

The law of this State gives the right to any railroad company, or person who may be interested, to institute, in any court of Travis County having jurisdiction of the subject matter, a suit to test "the decision of any rate, classification, rule, charge, order, act or regulation adopted by the Commission, such dissatisfied company or party to file a petition setting forth the particular causes of objection to such decision," etc. The test to be applied to every such decision is, that it shall not be unreasonable or unjust to such railroad company or other person complaining. The great number of subjects to which this action may apply, and the fact that it may embrace all or any one of them, and may be instituted by any person interested, for any cause which will show it to be unreasonable, manifests an intention on the part of the Legislature to establish a much more liberal rule than previously existed upon this subject. The decision made in establishing rates, classifications, rule, charge, orders or other regulation, might frequently be unreasonable and unjust, and yet might not amount to the taking of property without proper compensation, or without due process of law. Indeed, as to some persons who might be affected, and in the performance of some of the acts enumerated, the property would not be taken at all, and therefore the test which the Attorney General would apply could not be applicable. For example, a shipper of cotton might institute just such a proceeding as this to set aside and annul these regulations, and yet, in the regulation made, his property would not be taken nor in any way appropriated, for he is not required to have his cotton compressed, nor to pay for it unless he chooses to do so, but, in fact, his convenience and his substantial right of control of his property might be interfered with by this character of regulations, to such an extent as to be unreasonable and unjust towards him, without either taking his cotton or imposing any charge upon it. The language of the law is so antagonistic to the rule established by the decisions, which construction is claimed to have been adopted by the Legislature, that we must conclude that the Legislature intended to change those rules in their application to the subjects embraced in the articles quoted, otherwise there was no need for the articles 4565 and 4566. Indeed, the conferring of that jurisdiction upon the courts, of itself, imposed the duty to try the case by the ordinary rules of procedure, unless otherwise provided. The Attorney General urges the inconveniences of such a rule and the possibility of blocking the business of the Commission by such proceedings. It may not be a wise policy to extend this liberality to those who are affected by the exercise of the powers conferred upon the Commission, but

that question is for the legislative branch of the government, and not for the courts, to deal with.

To the first question we answer: The railroad commission had jurisdiction and authority to make and enforce the regulations shown in the statement accompanying the questions.

To the second question we answer: In actions of this character the courts will determine the question of the reasonableness and justice of any matter by the same rules as if it were an issue in other classes of suits, except as to the conclusive character of the evidence.