**LO–VACA GATHERING COMPANY,
Appellant,**

v.

**MISSOURI–KANSAS–TEXAS RAILROAD
COMPANY, Appellee.**

No. 11866.

Court of Civil Appeals of Texas,
Austin.

Feb. 9, 1972.

Rehearing Denied March 1, 1972.

W. T. Blackburn, Corpus Christi, for appellant.

Graves, Dougherty, Gee, Hearon, Moody & Garwood, Dan Moody, Jr., Austin, for appellee.

O'QUINN, Justice.

Decision in this case turns upon whether a pipeline company has the right to install its pipes across a railroad right of way without first obtaining consent of the railroad or first obtaining such right by condemnation.

About two months before this lawsuit was instituted Lo-Vaca Gathering Company, the appellant, sought permission of Missouri-Kansas-Texas Railroad Company, the appellee, to cross the railroad company's right of way with a pipeline, but thereafter declined to accept a license to cross the railroad on the terms and conditions suggested. The pipeline company then advised the railroad company that it planned to proceed without delay with construction of the pipeline without consent and without bringing condemnation proceedings.

The railroad company filed this lawsuit to enjoin the pipeline company and to obtain a declaration of the parties' rights. The trial court entered an interlocutory

order permitting the pipeline company to proceed, on the posting of a bond, and the pipeline was constructed, subject to determination of the rights of the parties in this suit.

The trial court after a hearing on the merits determined that the pipeline company did not have the right to construct its pipeline across the railroad right of way without consent of the railroad company or acquisition of the right by a condemnation proceeding. We affirm the judgment of the trial court.

Appellant, sometimes referred to hereafter as Lo-Vaca, brings thirty-nine points of error, which present but two basic issues. First, Lo-Vaca contends that Article 1436, Revised Civil Statutes of Texas, grants the pipeline company the right to construct its pipelines across any railroad right of way in the state without consent of the railroad company and without necessity of condemnation. Second, Lo-Vaca claims the right to cross the railroad right of way, at the point where the pipeline was constructed, under authority of easements from adjoining landowners.

We consider first the effect of Article 1436 under the facts of this case. That statute reads:

"Such corporation shall have the right and power to enter upon, condemn and appropriate the lands, right-of-way, easements and property of any person or corporation, and shall have the right to erect its lines over and across any public road, railroad, railroad right-of-way, interurban railroad, street railroad, canal or stream in this State, any street or alley of any incorporated city or town in this State with the consent and under the direction of the governing body of such city or town. Such lines shall be constructed upon suitable poles in the most approved manner, or pipes may be placed under the ground, as the exigencies of the case may require." (As amended by Acts 1967, 60th Leg., p. 730, ch. 306, sec. 1, effective August 28, 1967)

Lo-Vaca urges that Article 1436 authorizes gas pipelines to be laid across any railroad or railroad right of way in this state, and that further authority, by consent of the railroad company or through condemnation, is not required because of the provisions of the statute. In this connection, Lo-Vaca takes the position that because railroads are "public highways," by declaration of the Constitution of Texas, an express reservation has been made of "rights in the public for public use of railroad properties of a sort that can legally be made of highways, such as for pipelines."

We examine at the outset the contention grounded on provisions of the Constitution of Texas. The section declaring railroads to be "public highways" is quoted:

"*Railroads* heretofore constructed or which may hereafter be constructed in this state are hereby *declared public highways,* and railroad *companies, common carriers.* The Legislature shall pass laws to regulate railroad, freight and passenger tariffs, to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different railroads in this state, and enforce the same by adequate penalties; and to the further accomplishment of these objects and purposes, may provide and establish all requisite means and agencies invested with such powers as may be deemed adequate and advisable." (Constitution of Texas, Art. X, sec. 2, as amended by the electorate November 4, 1890, Vernon's Ann.St.)

As adopted in the Constitution of 1876, this section did not include the final clause, providing for "all requisite means and agencies" for "accomplishment of these objects and purposes" of the provision, which was added in 1890 to insure validity of the Railroad Commission of Texas created in 1891. Moore v. Bell, 95 Tex. 151, 66 S.W. 45, 46 (1902); Railroad Commission of Texas v. Weld, 95 Tex. 278, 66 S.W. 1095, 1096 (1902). But the first sentence of this section, declaring railroads

then existing and later constructed, to be "public highways, and railroad companies, common carriers" has remained unchanged since 1876.

To give this provision of the Constitution the construction urged by Lo-Vaca would deny railroad companies private property rights in their railways and the rights of way they occupy. Both parties tried this case on the theory that it is immaterial whether the property right claimed by the railroad in its right of way is an easement or a fee title.

■■ It seems clear from the debates in the Constitutional Convention of 1875 that the designation of railroads as public highways was incorporated for the limited purpose of devoting such property to limited public use in the hands of common carriers, and to guarantee to the public the right to travel as passengers and to ship goods by rail without discrimination and to subject the rail companies and their roads to control by the state to that end. (Debates in the Texas Constitutional Convention of 1875, McKay, pp. 387–389) In making the railroads public highways the railroad companies were not denied the right of private property in the railroads and the lands they occupy. Texas Central Railway Co. v. Bowman, 97 Tex. 417, 79 S.W. 295 (1904); Heilbron v. St. Louis Southwestern Railway Co., 52 Tex. Civ.App. 575, 113 S.W. 610, 613, 1908, reh. den. 52 Tex.Civ.App. 575, 113 S.W. 979; Railroad Commission of Texas v. Houston & Texas Central R. Co., 90 Tex. 340, 38 S.W. 750, 753, 754 (1897); Ft. Worth & D. C. Ry. Co. v. Rogers, 21 Tex.Civ.App. 605, 53 S.W. 366, 368 (1899) (no writ).

■ It is a rule of law recognized at common law in this country and in England that " . . . when private property is devoted to a public use, it is subject to public regulation," and that the private right in property is lost only to the extent of the interest created in the public use of such property. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77 (1876); Houston & T. C.

Ry. Co. v. Rust & Dinkins, 58 Tex. 98, 109–110 (1882).

Article X of the Texas Constitution, dealing with railroads, was taken by the framers of the Constitution largely from Article XVII of the Constitution of Pennsylvania, ratified late in 1873, which became effective January 1, 1874, about twenty months prior to the opening of the Texas convention at Austin in September, 1875. (See commentary, Art. 10, sec. 2, Vernon's Anno.Tex.Const.; and McKay, supra, p. 389). In two separate proposals in the Texas convention, as well as in the committee report and in the final draft as submitted to the electorate, railroads theretofore constructed, or thereafter to be constructed, were declared "public highways" and by other language the rail companies were declared common carriers. (Journal of the Constitutional Convention of the State of Texas, 1875, pp. 30, 88, 377, 817)

Interpretation of language by which railroads were declared public highways has been made by the Supreme Court of the United States and by courts of several states. In each instance the language was construed to mean that as a public highway the railroads were under public control as common carriers, without loss of the right of private ownership in their rail rights of way.

In Western Union Telegraph v. Pennsylvania Railroad Company, 195 U.S. 594, 25 S.Ct. 150, 49 L.Ed. 332, the Supreme Court of the United States denied Western Union the right to occupy the railroad's right of way with telegraph lines under a Pennsylvania statute making it lawful for a telegraph company to erect its structures "along and across any of the roads, highways, streets, and waters within" the state "to be so placed as not to interfere with the common use of such roads, highways, [etc.]" The Supreme Court said, "Highways and railroads may be assimilated in legal contemplation to a certain extent, and considerations which apply to one

within that extent apply to the other. To apply them beyond that extent would be to confound the distinctions of common speech and practice, and *destroy property rights long recognized to exist.*" (195 U.S. 597, 25 S.Ct. 152) (Emphasis added)

In Lake Superior & Mississippi R. R. Co. v. United States, 93 U.S. 442, 451, 23 L.Ed. 965 (1876) it was said that "in view of the legislative history" of provisions declaring railroads to be public highways, the declaration means that the railroad "shall be open to the use of the public with . . . [the railroad's] own vehicles."

The Supreme Court of Mississippi followed Western Union Telegraph v. Pennsylvania Railroad Company in 1967 and stated the principle of law there announced in this language:

"It is true that a railroad is a highway in a certain sense, and, as such, may be controlled by the Legislature of a state under its police power, but it is also private property, and, as such, is entitled to the protection guaranteed to property owners under the Federal and State Constitutions, so that it can only be taken under the power of eminent domain, with compensation to the owner. Western Union Tel. Co. v. Pennsylvania R. R. Co., 195 U.S. 540, 25 S.Ct. 133, 49 L.Ed. 312 (1904)." White v. Mississippi Power and Light Company, 196 So.2d 343, 353 (Sup. Ct.Miss.1967).

A Pennsylvania court recognized the dual role of railroad trackage and the lands thus occupied and stated, "The railroad's right of way and tracks are its private property, but subject to public use." Lehigh Nav. Coal Co. v. Pennsylvania Public Utility Commission, 133 Pa.Super. 67, 1 A.2d 540 (1938).

The rule governing the dual role of railroad rights of way has been established affirmatively also by courts in North Carolina, Illinois, Missouri, and Kansas. State v. Rives, 27 N.C. 297; Burlington, K. & S. W. R. Co. v. Johnson, 38 Kan. 142, 16

P. 125; Lord v. City of Chicago, 274 Ill. 313, 113 N.E. 597; Kotz v. Illinois Central Railway Co., 188 Ill. 578, 59 N.E. 240; Clark v. Chicago & A. R. Co., 127 Mo. 197, 29 S.W. 1013, 1016 (1895).

We return now to further consideration of Lo-Vaca's contention that under Article 1436 pipeline companies may construct their pipelines across railroad rights of way without consent of the railroad and without condemnation. Aside from the argument that railroads are public highways within the meaning of the statute, an argument we reject as without merit, Lo-Vaca insists that "it is clear from the structure of the first sentence of Article 1436 that the Legislature did not mean that such corporation should have to condemn for their [sic] right-of-way across any public road, railroad, railroad right-of-way, interurban railroad, street railroad, canal or stream in this State."

The reasoning behind this construction by Lo-Vaca is that the first sentence "has a compound predicate," and "Such Corporation," as used in the sentence, is the "subject of both clauses of the compound predicate" with "the clauses . . . somewhat symmetrical and . . . [having] essentially the same main verb structure, the first clause stating ' . . . shall have the right and power . . . ' and the second one stating ' . . . shall have the right . . . '"

Lo-Vaca continues: "The infinitive[s] after those verb phrases in the first clause are (1) to enter upon, (2) to condemn, and (3) to appropriate." What can be entered upon, condemned, and appropriated, Lo-Vaca argues, are "The lands, right-of-way, easements and property of any person or corporation." But, upon arriving at the second clause, " . . . the infinitive there is simply 'to erect', that is, 'Such corporation . . . shall have the right to erect . . . '"

Lo-Vaca insists it is significant that "the word 'condemn' is omitted" from the second clause, giving it the meaning that

a corporation, under the second clause, may construct its pipelines " . . . over and across any public road, railroad, railroad right-of-way . . . " Since the Legislature failed to insert the word "condemn" in the second clause, Lo-Vaca argues, " . . . the Statute must be construed as written."

We assume from this argument that Lo-Vaca asks this Court to construe the statute according to the syntax Lo-Vaca finds in it, rather than by the rules of construction the courts are required to employ.

It is not uncommon that an enactment of the Legislature, fabricated by the hands of its many law makers, will emerge from that complex assembly line with the syntax of the statute so put together as not to articulate strictly according to the Hoyles of grammar. The courts are not called upon to judge the meaning and effect of a statute by the rules alone of the arbiters of grammar, who themselves are not always in agreement and are aligned today in several schools of thought.

Goold Brown, whose 1,000-page masterpiece ("Grammar of English Grammars", 1851) became the basic tool for grammarians in this country, found in a catalogue of 430 grammarians only three who satisfied his standards. The others he criticized adversely. Dr. Brown characterized Noah Webster's "multifarious grammars" as "despised" and gave Samuel Worcester less than honorable mention. The three grammarians Dr. Brown accepted were Dr. Brown himself and two others. He said, "Few writers have been more noted than William Lily [1793] and Lindley Murray [1795]." To which Dr. Brown added, ungrammatically, "Others have left better monuments of their learning and talents, but none perhaps have [sic] had greater success and fame."

Dr. Brown catalogued the works of 430 grammarians and, on "grammatical authorship", observed, "From misapprehension, narrowness of conception, or improper bias . . . many authors have started wrong; denounced others with intemperate zeal; departed themselves from sound doctrine; and produced books which are disgraced not merely by occasional oversights, but by central and basic errors." Even in 1851 Dr. Brown held the view that in general, " . . . we find among writers on grammar two numerous classes of authors, who have fallen into opposite errors, perhaps equally reprehensible; the visionaries, and the copyists. The former have ventured upon too much originality, the latter have attempted too little." Here, in the last sentence, Dr. Brown himself commits the now condemned "comma blunder."

In 1971 the authors of "Modern English" recognized at least three current systems of grammar: conventional, structural, and transformational; and sought to contrast descriptions from the three theories of grammar, in which systems varying emphasis is placed upon syntax. (*Modern English,* Arnold Lazarus, Andrew MacLeish, and H. Wendell Smith, 1971)

As Dr. Brown said, "There are disputable principles in grammar, as there are moot points in law; but this circumstance affects no settled usage in either . . . All are free indeed from positive constraint in their phraseology; for we do not speak or write by statutes." To which he added the indictment that " . . . while new blunders have been committed in every new book [on grammar], old ones have been permitted to stand as by prescriptive right; and positions that were never true, and sentences that were never good English, have been published and republished . . . till our language grammar has become the most ungrammatical of all studies!"

The courts are empowered to determine issues of law, but not the rules of syntax. Any attempt by the courts to overrule the holdings of one school of grammarians and to sustain the pronouncements of another would be fruitless and a mere gratuity.

In construing a statute, courts are guided by the fundamental rule that the intention of the Legislature is to be ascertained from the statute itself upon an examination of the entire enactment. City of Mason v. West Texas Utilities, 150 Tex. 18, 237 S.W.2d 273 (1951). The rule as stated recently by the Supreme Court is: "The dominant consideration in construing a statute is the intention of the Legislature. We must ascertain the purpose for which the statute was enacted." Flowers v. Dempsey-Tegeler & Co., 472 S.W.2d 112 (Tex.Sup.1971).

The seeming want of lucidity pointed out by Lo-Vaca in Article 1436 loses significance upon examination of the statute in the light of its legislative history and the plausible purposes for which the statute was enacted.

Article 1436 as originally enacted in 1911 was section 4 of Senate Bill 265 authorizing the creation of corporations to manufacture, transport, and sell gas and electric current. (Acts 1911, 32nd Leg., p. 228, ch. 111).

The caption of the bill in pertinent part described it as "An Act authorizing the formation of corporations for the purpose of generating, manufacturing, transporting and selling gas, electric current and power . . . to construct, maintain and operate . . . such machinery, apparatus, pipes . . . devices, and arrangements as may be necessary to operate such lines at and between different points in this State, and to own, hold and use lands, rights of way, easements . . . necessary for the purpose, with the right to enter upon, *condemn and appropriate lands, rights of way, easements* and *property of any* person or *corporation* and erect lines over and across public roads, railroads, interurban and street railroads . . . and streets and alleys of any incorporated city or town, with the consent and under the direction of the governing board of such city or town, *all in the same manner as is provided by law in the case of railroads, pipe lines, telephone*

*and telegraph lines,* and providing for the manner of construction . . . ." (Emphasis added)

Section 4 of the Act, immediately following the clause " . . . with the consent and under the direction of the governing board of such city or town", contained the following provision: "The *manner and method of such condemnation* shall be the same as provided by law in the case of railroads, pipe lines, telephone and telegraph lines . . . " (Emphasis added)

This last clause, prescribing the mode of condemnation required of gas pipelines when appropriating the "lands, rights of ways, easements and property of any person or corporation", became unnecessary when the Act of 1911 was placed in the Code of 1925, and was removed. Article 1436, under the Code of 1925, is included in Title 32, Chapter Ten, Public Utilities, which encompasses "1. Telegraph", "2. Telephone and Telegraph", "3. Water", "4. Gas and Light", and "5. Sewerage."

The clause Lo-Vaca relies upon, in support of its argument that pipeline companies are authorized to cross railroad rights of way without obtaining consent and without condemnation, was placed in section 4 of the 1911 Act with a decision of the Supreme Court of Texas constructively before the law makers. In 1903 the Supreme Court, on certified questions from this Court, resolved an existing conflict in the holdings of courts of civil appeals and held that a telegraph company had " . . . the same authority to condemn a right of way . . . [of a railroad] that it would have to condemn the property of others . . . ." Fort Worth & R. G. Ry. Co. v. Southwestern Telegraph & Telephone Co., 96 Tex. 160, 71 S.W. 270, 275 (1903).

The Supreme Court stated there that the Legislature had determined " . . . that such a use of the property [right of way] is one to which it may be applied consistently with the prior use . . . " and that therefore " . . . no question as to

the comparative importance of the two uses is left open for the courts to determine." (71 S.W. 275, col. 1)

In that case the Supreme Court observed that such condemnations had been sustained by some courts of civil appeals, and by others the right had been denied. Not only had opposite results been reached by the courts, but it was shown that contracts for use of railroad rights of way had been made, prior to the statute there under consideration, " . . . between railroad companies and one telegraph company for the exclusive use of rights of way."

We must assume from the language of Article 1436, expressly authorizing pipeline companies to cross railroad rights of way, was used to determine legislatively that use of a railroad right of way by a pipeline crossing would be consistent with the prior use and that "no question as to the comparative importance of the two uses" would be "left open for the courts to determine."

In holding that Article 1436 authorizes the corporations there named to erect lines "over and across", but not "along and upon" public ways, the Supreme Court in 1947 determined that an additional reason motivated the Legislature in its enactment of the statute. Incorporated Town of Hempstead v. Gulf States Utilities Co., 146 Tex. 250, 206 S.W.2d 227 (1947).

There the Court found plausible the suggestion that Articles 1435 and 1436 were enacted "to ameliorate the hardships arising from the holding in Jacksonville Ice & Electric Co. v. Moses, 63 Tex.Civ.App. 496, 134 S.W. 379, error refused . . . " In the Jacksonville case an electric wire, suspended across a public road, had fallen and caused injury, the wire having been "extended across the highway without authority." The court of civil appeals held that the electric company "was maintaining a nuisance and was responsible absolutely, and without reference to negligence, for what-

ever injuries were caused by the maintenance of such an obstruction." (134 S.W. 386)

The Supreme Court concluded that it was manifest from the language employed in the statute that the Legislature intended to make legal such crossings, and analyzed and construed Article 1436 in these words:

"Significantly, these corporations were given the extraordinary power of eminent domain, and in connection with extending electric transmission lines along rights of way which they were empowered to acquire either by purchase or condemnation, these companies might, when they came to 'any public road, railroad, railroad right of way, interurban railroad, street railroad, canal or stream in this State,' erect their lines 'over and across' them. *And if, for instance, permission to cross a railroad right of way should be refused, electric power corporations might effectively resort to condemnation."* (Emphasis added) (206 S.W.2d 229) This construction of Article 1436 as to electric corporations applies alike, of coures, to pipeline corporations named in the statute.

■ There is additional reason to hold that Article 1436 does not empower pipeline corporations to cross railroad rights of way without first obtaining consent or resorting to condemnation. Since the rights of way of railroads, whether held as easements or in fee, are private property, the Legislature was without authority under the Constitution of Texas to authorize the taking of such property without adequate compensation, unless by consent of the railroad company. Article I, sec. 17, Texas Constitution. The courts will not presume that the Legislature intended to enact a statute in violation of the Constitution, and the legislation will not be so construed when the law is susceptible of a different construction. White v. Fahring, 212 S.W. 193, 195, Tex.Civ. App. Galveston 1919, writ ref.

We hold that Article 1436 was not intended by the Legislature to empower pipeline companies to install their lines over and across railroad rights of way without first gaining consent of the railroad company or resorting to condemnation to acquire such right. We conclude that it was the express intent of the Legislature in adopting Article 1436 to give pipeline corporations the extraordinary power of eminent domain to extend their lines over and across railroad rights of way if permission to cross any such right of way should be refused by the railroad.

The language of the Supreme Court, in construing the statute before the Court in Fort Worth & R. G. Ry. Co. v. Southwestern Telegraph & Telephone Co., *supra*, may be applied appropriately to our construction of Article 1436:

"We must assume that this language was used for a purpose, and it can best be subserved by giving to the words of the statute their true and legitimate meaning, rather than by frittering them away by construction." (71 S.W. 274, col. 2)

Lo-Vaca's position with respect to the second basic issue in this case is that when the pipeline company acquired easements from the owners of land adjoining the railroad right of way, it acquired the right also to cross the railroad property.

The various instruments under which Lo-Vaca holds right of way strips approaching, or leading from, the crossing of its pipeline over the railroad right of way contain no express grant by the adjacent landowners of rights in or under the railroad right of way. The easements Lo-Vaca obtained from the landowners on both sides of the railroad are essentially the same. In each instance, the land across which the easement is granted is identified by reference to a description in an earlier recorded deed. In each instance the deed to which reference is made contains a description by metes and bounds that stops at the boundary of the railroad right of way, then runs along that boundary, but in no instance does the description purport to extend across or into the railroad right of way. Nor does the landowner in any deed purport to grant an easement across whatever land the grantor may own, but in each easement deed the grant is across only the land described in the deed to which reference is made.

In contending that these easement deeds from adjacent landowners also include the right to cross the railroad right of way, Lo-Vaca relies upon decisions which have established the rule that conveyance of fee title to property bordering a railroad right of way generally will convey whatever rights the grantor has to the center of the right of way, even though the property is described as being bounded on one side by the right of way. See State v. Fuller, 407 S.W.2d 215 (Tex.Sup.1966); Cox v. Campbell, 135 Tex. 428, 143 S.W.2d 361 (1940); Rio Bravo Oil Co. v. Weed, 121 Tex. 427, 50 S.W.2d 1080 (1932); Joslin v. State, 146 S.W.2d 208, Tex.Civ.App. Austin 1940, writ ref. In Cox v. Campbell the Supreme Court stated that the " . . . rule is not overcome even though the field notes describing the land stop at the side line of the . . . railroad right of way, unless a contrary intention is expressed in plain and unequivocal terms." (143 S.W. 2d 366, col. 1)

Lo-Vaca invokes the principle, as found in State v. Fuller, and argues the point in this statement:

"In the *Fuller* case, each of the two deeds involved purported to desribe [describe] the properties conveyed therein as being bounded on one side by a railroad right-of-way. Nevertheless, the Supreme Court held that each of the abutting fee owners owned the fee to the center of the contiguous railroad right-of-way. Therefore, *when each of them granted a pipeline right-of-way across his land* the con-

clusive legal effect of that grant was *to grant such easement to the center of the railroad right-of-way as to each pipeline easement.*" (Emphasis added)

Since the facts of *Fuller* do not in any way involve the granting of pipeline easements, we assume that the last sentence makes reference only to the grants of pipeline easements in the case at bar. We therefore take it that this faulty reference was not intended to suggest that in *Fuller* the Supreme Court rested its decision on facts identical with the facts of this lawsuit.

In *Fuller*, as in the other cases cited, the conveyence under consideration involved the grant of fee simple title and not the conveyance of an easement or right of way. The reasoning at least in part, behind the doctrine that in the passing of fee title to a tract of land the grantee acquires to the center of an adjoining railroad right of way is found in the following language of the Supreme Court in Rio Bravo Oil Co. v. Weed:

"It may be admitted that one owning land adjacent to a railroad right of way does not enjoy the same advantages and benefits as are incident to property bounded by a highway or stream. There are, however, certain benefits and privileges just as substantial, though differing in kind, enjoined by a person owning land situated upon a railroad right of way. * * * If it be determined that these narrow strips of right of way do not pass with the grant when land is sold which abuts on a railroad right of way, *upon abandonment of the easement by the railway company*, the adjoining landowner will be deprived of substantial benefits and privileges, as the then owner of such narrow strip of land would not be required to maintain private roads across the same, nor would he be subject to the same burden as railway companies in maintaining culverts and sluices." (Emphasis added) (50 S.W.2d 1085–1086)

■ Deeds conveying the title to land are subject to the familiar rule of construction that it will be presumed that the grantor intended to convey to his grantee all of the appurtenant rights incident to the beneficial enjoyment of the property conveyed. See *Weed*, 50 S.W.2d 1084; Cox v. Campbell, 143 S.W.2d 364. In *Weed* and in *Campbell* it was pointed out that the benefits and advantages appurtenant to the fee in land usually are of compelling force in inducing the sale of the property and that appurtenances to premises essential to proper enjoyment of the land will be held to pass even when the term appurtenant is not used in the deed. Stated another way, the grantor in passing the fee would have little or no cause to retain only such rights as he might have in the railroad right of way alone.

■ It cannot be said that the same or like reasons obtain to indulge a similar presumption with respect to deeds passing only an easement or right of way. It is widely recognized that the rules regarding interpretation of deeds are equally applicable in general for the construction of easements. 21 Tex.Jur.2d Easements, sec. 14; 25 Amer.Jur.2d Easements and Licenses, sec. 72. The intention of the parties is the consideration of primary importance. Kothe v. Harris County Flood Control District, 306 S.W.2d 390, Tex. Civ.App. Houston 1957, no writ. We find nothing in the easement deeds from the adjacent land owners to Lo-Vaca to indicate an intention on the part of the grantors to convey the right to construct a pipeline across the existing railroad right of way, nor is there anything to indicate an intention or expectation on the part of Lo-Vaca to obtain such right under the easement deeds. The trial court made and filed findings of fact and conclusions of law in which the court found that " . . . the adjoining landowners did not intend or purport to grant to Defendant [Lo-

Vaca] or its predecessor in title a pipeline easement across or under Plaintiff's railroad right-of-way."

None of the decisions cited and relied upon by Lo-Vaca, for the proposition that the grantor of fee title in land will be presumed to convey to the center of an adjoining railroad right of way, is controlling of the facts in this case. We have found no decision and none has been brought to our attention holding that the same rule applies to the conveyance of less than fee title, such as an easement or right of way. As already observed, the underlying reasons for such rule are not present in grants of easements such as under consideration in this lawsuit. We find no basis upon which we are required to indulge in the presumption that the grantors meant to convey more than was specified and described in the terms of the easement deeds.

By what has been said, we have disposed of the two main issues mentioned at the outset. First, we hold that Article 1436 does not grant a pipeline company the right to construct its lines across a railroad right of way without consent of the railroad company or resort to condemnation. Second, we hold that the adjoining landowners did not grant to the pipeline company authority to cross the railroad right of way with pipelines.

We overrule all points of error brought by Lo-Vaca in support of contentions under these two issues. In view of our disposition of the two determining issues in this case, we do not reach the remainder of appellant's points of error, which are rendered no longer pertinent.

The judgment of the trial court is in all things affirmed.

Affirmed.

SHANNON, J., not sitting.